**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| **MANOJ AGGARWAL** *et al,* | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Case No. **1:12-cv-60** |
| | : | |
| **OM SIKKA** *et al.* | : | |
| Defendants | : | |
| | : | |

**FIRST AMENDED**
**COMPLAINT FOR DAMAGES FOR BREACH OF**
**CONTRACT, FRAUD, AND RELIEF UNDER**
**THE RACKETEERING INFLUENCED CORRUPT PRACTICES ACT**
**AND THE ROBINSON-PATMAN ACT**
**(Jury Demand)**

Come now the Plaintiffs by undersigned legal counsel and, pursuant to this First

Amended Complaint, sue the Defendants for damages arising out of the purchase of a gasoline

service station and damages related to competition in the retail gasoline market as follows:

1.  Plaintiffs Manoj and Anu Aggarwal are competent adults, husband and wife, residing

at the address in the Caption.  They are the holders of all of the shares of Plaintiff Energy Depot,

Inc.

2.  Plaintiff Energy Depot, Inc. is a Virginia corporation with its principal place of

business listed in the Caption.

3.  Defendants Om Sikka, Kamla Sikka and Yash Paul Sikka are competent adults

residing at the address listed in the Complaint.  Upon information and belief, all of these

individuals are related and all of these individuals and one or more of these individuals are the

holders of all of the shares of Defendant Auto Fuels, Inc.

-1-

4. Defendant Auto Fuels, Inc. is a Virginia corporation with its principal place of business as listed in the Caption.

5. Defendants Om Sikka, Kamla Sikka and Yash Paul Sikka are shareholders, directors, employees, contractors and/or authorized agents of Defendant Auto Fuels, Inc.

6. Defendants Om Sikka, Kamla Sikka and Yash Paul Sikka have a personal financial stake in Defendant Auto Fuels, Inc. and they personally benefit from transactions involving Defendant Auto Fuels, Inc.

7. Defendant PW Petroleum, Inc. is a Virginia corporation with its principal place of business as listed in the Caption.

8. Defendant Chady Nasr is a competent adult residing at the address listed in the Caption. Upon information and belief, this Defendant is related to Defendant Carine Moussa a/k/a Carine Nasr and one or both of these individuals are the holders of all of the shares of Defendant PW Petroleum, Inc.

9. Defendant Carine Moussa a/k/a Carine Nasr is a competent adult residing at the address listed in the Caption.

10. Defendant Petroleum Marketing Group, Inc. is a Virginia corporation with its principal place of business as listed in the Caption.

## JURISDICTION & VENUE

11. Jurisdiction is proper under 28 USC §1337, and 28 USC §1331, and 28 USC §1367 and 18 USC §1965.

12. Venue is proper pursuant to 28 USC §1391.

## FACTS COMMON TO ALL COUNTS

13.  On or about July 22, 2008, Defendants Om Sikka, Kamla Sikka, Yash Paul Sikka and their corporation, Auto Fuels, Inc., and/or one or more of these individuals and entity, closed as sellers, on the purchase of the business assets of a then-branded Crown gasoline service station and convenience store located at 13295 Trowbridge Dr., Woodbridge, VA 22192 (herein the "Premises").  At that closing, they purchased these assets from Defendant PW Petroleum, Inc. and/or Chady Nasr and/or Carine Moussa a/k/a Carine Nasr.  In this Complaint, the individuals will be referenced collectively as "the Sikkas," Auto Fuels, Inc. will be referenced as "AFI," PW Petroleum, Inc. will be referenced as "PWP," Chady Nasr will be referenced as "Nasr" and Carine Moussa a/k/a Carine Nasr will be referenced as "Moussa a/k/a Carine Nasr."

14.  On February 13, 2010, the Plaintiffs signed a Business Sales & Purchase Agreement (the "Purchase Agreement" herein) with Defendant Om Sikka for the purchase of the business conducted at the Premises, consisting of the gasoline service station and the convenience store. In this Complaint, the gasoline service station, convenience store, and related businesses will be referenced as the " Business".  Business Brokers USA, Inc., a Virginia corporation, was engaged by the Sikka Defendants to broker the sale of this gas station.  All of the information and documentation related to said sale was provided to Business Brokers, USA, Inc. by the Sikka Defendants.

15.  Prior to signing the Purchase Agreement, Plaintiffs received a Confidential Business Abstract bearing a date of October 5, 2009 from Business Brokers USA Inc. (herein "Business Brokers") and Sethi representing certain material financial information regarding the Business.

16.  The information contained in the Confidential Business Abstract contained

representations which were materially false and misleading and the false and misleading

information was known by the Sikka Defendants to be false and misleading, and this information

was deliberately, or as a result of gross negligence, or as a result of negligence, presented to the

Plaintiffs with the specific intent that the Plaintiffs rely upon this information in deciding to

acquire the Business and the Plaintiffs did, in fact, reasonably rely on this information when they

made a decision to acquire the Business.

17.   The Sikka Defendants had a duty to properly disclose the financial information

presented to the Plaintiffs or to inform the Plaintiffs of correct and accurate financial

information, or to unequivocally inform the Plaintiffs that they did not know whether or not this

information was accurate or not, and to disclose to the Plaintiffs information regarding the

wholesale pricing of motor fuel, which duty they breached.

18.   In the alternative, the information contained on the Confidential Business Abstract

contained representations which were materially false and misleading and the false and

misleading nature of this information was known, or should have been known by the Sikka

Defendants to be false and misleading, and this information was deliberately, or as a result of

negligence presented to the Plaintiffs despite the fact that these Defendants knew that the

Plaintiffs would rely upon this information in deciding to acquire the Business and the Plaintiffs

did, in fact, reasonably rely on this information when they made a decision to acquire the

Business.  These Defendants had a duty to properly disclose the financial information presented

to the Plaintiffs or to inform the Plaintiffs of correct and accurate financial information, or to

unequivocally inform the Plaintiffs that they did not know whether or not this information was

accurate or not, and to disclose to the Plaintiffs information regarding the wholesale pricing of

motor fuel, which duty they breached.

19.   In fact, the financial information related to the Business as alleged above was materially false, misleading, and fraudulent and presented to the Plaintiffs by the Sikka Defendants with the intent that the Plaintiffs rely on this information in their decision to acquire the Business and the Plaintiffs did, in fact, detrimentally rely on this false and misleading and fraudulent information in making a decision to purchase the Business.

20.   One such misrepresentation was the characteristics of the motor fuel supply agreement assumed by the Plaintiffs in connection with purchasing the Business

21.   Plaintiffs were not given a complete copy of the Motor Fuel Supply Agreement at any time prior to Closing.  One page document that was faxed to Plaintiffs by Chady Nasr in September/October of 2010. That document clearly states the expiration date as 5 years later. Chady Nasr only shared that 1 page of the entire contract with me.  Plaintiffs became aware of the fuel supply agreement issue because Mr. Pat Thompson, the owner of Quest Transport, an affiliate and fuel transport company for Defendant PMG, had come to the Business in late summer of 2010 as a representative of Defendant PMG, as acting District Manager for that area. Plaintiffs had asked him to give them a better price for gasoline and show me the gas supply contract.  Mr. Thompson told Plaintiff Manoj Aggarwal there was nothing he could do to adjust the price as the Motor Fuel Supply Agreement was in place. I then mentioned to him that I would soon be looking for another supplier because I had a 5 year contract with PMG according to my landlord, Chady Nasr.  Mr. Thompson told Mr. Aggarwal that he was mistaken and that he had a 10 year contract. Mr. Aggarwal told Mr. Thompson that he wanted to see the contract. His reply to Mr. Aggarwal was that the Motor Fuel Supply Agreement was "none of my business," as it

was a contract between Defendant PMG and Defendant Chady Nasr.

22.   Plaintiff then called Defendant Chady Nasr as everyone associated with this deal had always told me it was a 5 year contract.  That is when Defendant Chady Nasr faxed Plaintiff  that 1 page. Plaintiff Aggarwal asked Defendant Nasr if he could see the entire contract.  Defendant Nasr refused to provide the entire contract.

23.   The representations concerning the 5-year term of the Motor Fuel Supply Agreement were made to Plaintiffs by all Defendants.

24.   Additionally, the Nasr Defendants represented to the Plaintiffs that the Business was operated profitably and confirmed the misrepresentations made by the Sikka Defendants.

25.   All such misrepresentations were made prior to the closing on the Business by the Plaintiffs in connection with negotiating the terms of the various agreements related to such closing.

26.   All of said false, misleading and fraudulent information and misrepresentation were made by the said Defendants with the intent that the Plaintiffs rely on this misinformation to their detriment.

27.   Additionally, all Defendants represented that Defendant PMG was a favorable supplier of gasoline and other petroleum products and that the Plaintiffs would be benefitted by entering into agreements with Defendant PMG to supply these products when, in fact, the petroleum products and gasoline to be supplied by Defendant PMG were grossly overpriced as alleged herein.

28.   Defendant PMG has a history of selling businesses using these techniques through Business Brokers, Sethi and Raheja.  This history constitutes an enterprise among these

Defendants and their related corporate Defendants.

29.  Defendant PMG has a regular practice of identifying and targeting immigrants and other foreign-born persons, engaging in scheme similar to the scheme set forth in this Complaint, and taking hundreds of thousands of dollars in down payments and hundreds of thousands of dollars in fuel overcharges and then driving said buyers out of business and then in some instances operating the gasoline service stations through affiliates and contractors and then reselling them again under the same conditions and using the same broker and accountant.  This history constitutes an enterprise among these Defendants and their related corporate Defendants.

30.  In order to induce the Plaintiffs to purchase Business, Defendant PMG represented to the Plaintiffs that if they accepted an assignment up the Motor Fuel Supply Agreement, they would be able to sell motor fuel profitably at the wholesale prices specified in said  Agreement. This misrepresentation was made by Abolhoussein Ejtemai, majority owner of the stock of Defendant PMG, and by other employees and agents of Defendant PMG.

31.  Defendant PMG knew or should have known that the Plaintiffs would not be capable of selling motor fuel profitably if they were required to purchase all of the motor fuel requirements pursuant to said Agreement.

32.  Defendant PMG made these misrepresentations knowing that they were false and misleading, intending the Plaintiffs to rely on these misrepresentations, and knowing that the Plaintiffs will rely on these misrepresentations in deciding to purchase the Business and enter into the Motor Fuel Supply Agreement.

33.  After acquiring the Business, the Plaintiffs discovered that, rather than being a business which was profitable, generating a "Owner's Net" of $120,000 a year, as stated in the

Confidential Business Abstract and in other documents and information and representations made by the Defendants, the Business was not profitable and was not capable of generating a profit. In fact, for the year prior to the closing, calendar year 2009, Defendant Auto Fuels, Inc. solely operated the Business, and for that year the Business showed a loss in excess of $30,000, and total cash paid or available to the Sikka Defendants of just in excess of $34,000.

34. The reason why the Business was not capable of generating a profit was because the supply agreement with PMG resulted in the Business being required to purchase petroleum products at an inflated wholesale price under an exclusive all-requirements supply agreement with PMG. As a result, the Business was incapable of selling sufficient volume of petroleum products in competition with neighboring gasoline service stations to make a profit and, in addition, the Business was required to sell at a retail price which was in some instances lower than the wholesale price for petroleum products, in order to generate business volume.

35. Defendant PMG knew of this characteristic of the Business and as a result, sought an successor to supply with motor fuel at the location, and participated in the misrepresentations concerning pricing of the wholesale motor fuel to induce the Plaintiffs to purchase the Business and lease the Business Premises from the Nasr Defendants and to find another purchaser after the failure of the business conducted by the Sikka Defendants.

36. The pricing conditions for petroleum products described above in Paragraph 22 of this Complaint existed at the time when the Business was acquired by Defendants Om Sikka, Kamla Sikka, Yash Paul Sikka and their corporation, Auto Fuels, Inc. and also when the business was acquired by the Nasr Defendants.

37. The pricing conditions for petroleum products sold by PMG under the exclusive

agreement described above was at all times known to  Defendants Om Sikka, Kamla Sikka, Yash Paul Sikka and their corporation, Auto Fuels, Inc. and the Nasr Defendants.

38.   The Nasr and Sikka Defendants and PMG would benefit financially from finding a successor to assume the Motor Fuel Supply Agreement because the retail motor fuel businesses of the Nasr and Sikka Defendants had failed at this location.

39.   All Defendants knew that said pricing conditions prohibited the Business from being operated profitably.

40.   All Defendants had a duty to disclose said pricing conditions as well as accurate financial information regarding the operation of the Business to the Plaintiffs prior to the Plaintiffs becoming obligated to purchase the Business.

41.   None of said Defendants disclosed said pricing conditions or accurate financial information and, had they disclosed these matters, the Plaintiffs would not have purchased the Business.

42.   Defendants PWP, and/or Nasr and/or Moussa a/k/a Carine Nasr where the owners of the Premises where the Business was conducted.

43.   Said Defendants sold the Business to Defendants Om Sikka, Kamla Sikka, Yash Paul Sikka and their corporation, Auto Fuels, Inc.

44.   Upon information belief, Defendants PWP, and/or Nasr and/or Moussa a/k/a Carine Nasr were not able to operate the Business profitably and they made materially false and misleading representations concerning the Business to Defendants Om Sikka, Kamla Sikka, Yash Paul Sikka and their corporation, Auto Fuels, Inc. in order to induce these persons and entities to purchase the Business and to lease the Premises from Defendants PWP, and/or Nasr and/or

Moussa a/k/a Carine Nasr.

45.  Defendants Om Sikka, Kamla Sikka, Yash Paul Sikka and their corporation, Auto Fuels, Inc. were not able to operate the Business profitably, and, as a result, they sold the Business to the Plaintiffs to get out from under the unprofitable operations.

46.  The Plaintiffs interviewed Defendants PWP, and/or Nasr and/or Moussa a/k/a Carine Nasr prior to purchasing the Business and these Defendants reinforced the false and misleading representations concerning the favorable profitability of the Business as alleged in this Complaint in order to induce the Plaintiffs to purchase Business and to continue to lease the Premises from Defendants PWP, and/or Nasr and/or Moussa a/k/a Carine Nasr.

47.  Defendants PWP, and/or Nasr and/or Moussa a/k/a Carine Nasr knew and intended that said favorable misrepresentations concerning the Business would induce the Plaintiffs to purchase the business and said Defendants would have a continuing stream of rental income and relief from liability under the Motor Fuel Supply Agreement.

48.  Said misrepresentations by Defendants PWP, and/or Nasr and/or Moussa a/k/a Carine Nasr were reasonably relied upon by the Plaintiffs in their decision to purchase the Business and enter into a lease with these Defendants.

49.  Plaintiffs did, in fact, reasonably rely upon said misrepresentations by Defendants PWP, and/or Nasr and/or Moussa a/k/a Carine Nasr in deciding to purchase the Business.

50.  Business Brokers USA Inc. has engaged in brokering sales of gasoline service stations, convenience stores, and related businesses owned, controlled, and/or supplied with gasoline by Defendant PMG under circumstances similar to those alleged herein.  Additionally, another broker, Hamid Nasvaderani has also engaged in such brokering.

51.   Defendant PMG entered into a Motor Fuel Supply Agreement originally dated May 1, 2006 with Defendant Chady Nasr and a non-party, and said Agreement was assigned to Defendants Auto Fuels, Inc, Om Sikka and Yash Sikka and Kamala Sikka on August 6, 2008, and assigned to Plaintiffs Energy Depot, Inc. and Manoj Aggarwal on April 22, 2010

52.   Pursuant to this Motor Fuel Supply Agreement, PMG agreed to sell wholesale motor fuel to the Plaintiffs on the following terms and conditions: one cent per gallon above PMG's cost to purchase the fuel at the terminal, plus transportation plus taxes and fees.

53.   There are a number of unrelated motor fuel terminals in the immediate vicinity of the Business location, including terminals located in Dumfries, Fairfax, Fredericksburg, Lorton and Manassas.

54.   Each of these terminals charges a different, and in many instances a materially different, wholesale price for motor fuel.

55.   Defendant PMG has used different terminals, each charging different wholesale prices, to provide fuel to Plaintiffs under the Motor Fuel Supply Agreement.

56.   In the course of operating the Business, Plaintiffs were told by Defendant Chady Nasr that the Motor Fuel Supply Agreement had terminated on April 30, 2011. Plaintiff Manoj Aggarwal then contacted Tiger Fuel Company, a Virginia wholesale motor fuel supplier which competes with Defendant PMG.  In the course of that contact, the representative of Tiger Fuel Co. informed the Plaintiff that Tiger Fuel could wholesale motor fuel to the Plaintiffs at a wholesale price which was $.19 below the price to be charged under the Motor Fuel Supply Agreement.

57.   Plaintiffs immediately contacted Defendant Chady Nasr and were told in no uncertain

-11-

terms that Nasr, as landlord, would not consent to having the Business supplied by any motor

fuel supplier other than Defendant PMG.

58.   Because the price of the motor fuel is based on a variable pricing based on the

different terminal prices, the Motor Fuel Supply Agreement is an "open-price" contract.

59.   Pursuant to The Virginia Uniform Commercial Code, §8.2 – 305. Open Price Term,

Defendant PMG has an obligation to sell wholesale motor fuel to the Plaintiffs for a reasonable

price fixed in good faith.

60.   In fact, Defendant PMG consistently sold all motor fuel to the Plaintiffs had a greatly

inflated price which was unreasonable and in bad faith, being in some instances higher than the

retail price charged by neighboring gasoline service stations for the same motor fuel.  Defendant

PMG knew in advance that it intended to sell motor fuel at such a price to the Plaintiffs, and

Defendant PMG was fully aware of the effect of this pricing structure on the ability of the

Defendant to operate profitably.

61.   At various times, and particularly after being informed of the Tiger Fuel Co. price,

personnel of Defendant PMG reassured the Plaintiffs, falsely, that they would adjust the

wholesale price of motor fuel and provide terms under which the Plaintiffs could operate the

Business more profitably.  No such adjustments were ever made.

62.   Despite said promises and reassurances, Defendant PMG continued the policy of

overpricing motor fuel.

63.   Pursuant to the Motor Fuel Supply Agreement, the Plaintiffs were obligated to

purchase all of the motor fuels sold from the Business location from PMG under the terms of

said Agreement.

64.  Plaintiffs were not able to operate the business profitably because they were never able to generate a positive cash flow with the wholesale fuel prices charged by Defendant PMG.

65.  In fact, unknown to the Plaintiffs until they ceased operating the Business under extreme financial duress in early March, 2011, the Business had never been operated profitably.

66.  Defendant PMG has a financial interest in continuing to sell wholesale fuel to the Business.

67.  Many of the gasoline service station transactions whereby a gas station is sold with an exclusive gasoline supply agreements with Defendant PMG  involve situation similar to the instant situation, that is, situations in which the former proprietor of a gasoline service station business is driven out of business by the unreasonably high wholesale gasoline prices charged by Defendant PMG, and then a set of false and misleading financial documents are prepared and forwarded to a new buyer who, on reliance on these documents, purchases the business, making a substantial down payment, and then fails, at which time the cycle repeats. The Plaintiffs in this case are the third failed business at this location, based on the same set of facts and circumstances.

68.  A similar situation exists in the case of *Kun Lee, et al. v PMG*, Case No. 02-C-09-141082, currently on appeal from the Circuit Court for Anne Arundel County, Maryland.  In that case, Defendant PMG overpriced wholesale gasoline after the Plaintiffs in that case acquired the service station after it had closed.

69.  In the case of *Gondel v. PMG*, Civil No. 2011-07927, the plaintiff was provided materially false and misleading information by Defendant PMG in order to induce the Gondel plaintiffs to purchase a gasoline service station and related real estate from an affiliate of

Defendant PMG, a corporation with some common ownership of stock.  Thereafter, Defendant PMG charged unreasonably high wholesale prices and this resulted in the Plaintiffs losing all their savings and going out of business.

70.  In the case of *Hasan et al. v. PMG*, Case No. 02-C-06-116010, in the Circuit Court for Anne Arundel County, Maryland, the jury found that Defendant PMG committed fraud in inducing the plaintiffs in that case to purchase a gasoline service station from Defendant PMG where Defendant PMG also supply the motor fuel to this location, under similar terms and conditions.

71.  The three court cases referenced above all involve a fact pattern where foreign-born individuals were fraudulent induced to purchase or lease gasoline service stations under the circumstances as alleged above.

72.  The material false and misleading representations made to the Plaintiffs herein by the various Defendants, as alleged above, were made by telephone, fax and e-mail as well as being made in person.

73.  Defendant PMG directly and through affiliates which it controls owns and operates retail gasoline service stations in the same market area as is served by the Business.  According to Defendant PMG's web site, http://petromg.com/inner/pmg.html, "In 2009, PMG acquisitions included 50 wholesale Shell Sites in Northern Virginia."  Many of these sites are owned and/or operated by independent operators not otherwise affiliated with Defendant PMG.  In addition, Defendant PMG wholesales motor fuels to non-affiliated gas stations in Northern Virginia, including gasoline stations purchased under the unfair circumstances described herein.  These non-affiliates are supplied in a manner similar to the Plaintiffs.

74. Defendant PMG regularly provides motor fuel to the retail gasoline stations which it owns and operates directly, and also through affiliates and to unaffiliated gas stations at a materially lower wholesale price than the price charged to the Plaintiffs.

75. This motor fuel is of the same grade and quality as the motor fuel supplied to the Plaintiffs. All motor fuel supplied to customers similarly situated with the Plaintiffs is of the same grade and quality.

76. John Ghebray, a former employee of Defendant PMG, has informed Plaintiffs that he was retained by Defendant PMG to operate gas stations which had been vacated by former owners under the circumstances described herein, and that these gas stations were supplied by Defendant PMG with motor fuel at a low wholesale price to make it appear to the next buyer as if the gas stations were selling a higher volume of motor fuel than the next would be able to sell under the pricing structure of Defendant PMG.

77. John Ghebray has also informed Plaintiffs that he was instructed by personnel of Defendant PMG to provide false gas sale volume figures and financial results to prospective purchasers of gas stations and to other motor fuel customers.

78. As a direct and proximate result of this price disparity, but Plaintiffs were inhibited and/or prevented from competing in the sale of motor fuel with other retail gasoline service stations to which Defendant PMG supplied wholesale motor fuel.

## COUNT ONE - BREACH OF CONTRACT - LEASE

79. Plaintiffs, by this reference, reallege all matters in all prior paragraphs herein as if fully set forth.

80.  The Defendants PW Petroleum, Inc. and/or Chady Nasr and/or Carine Moussa a/k/a Carine Nasr breached the Lease by inducing the Plaintiffs to enter into the Lease on the basis of fraudulent misrepresentations as alleged, and specifically by making representations to the Plaintiffs that the Business was the operated profitably if supplied by Defendant PMG as alleged.

81.  Said false, misleading and fraudulent misrepresentations also constitute a breach of any and all agreements related to the Lease as fraud in the inducement.

82.  As a direct and proximate result of said breach, the Plaintiffs are entitled to the following relief:

A.  Return of all monies paid as rent and related charges;

B.  Reimbursement for losses incurred in acquiring and operating the business in the amount in excess of $400,000.00;

C.  Damages for lost profits for the period of operations in the amount of approximately $120,000.00 or more, the actual amount to be proven at trial;

D.  Damages for lost profits of operation projected over the Lease term in the amount of approximately $360,000.00 or more, the actual amount to be proven at trial;

E.  Punitive damages of $2,000,000.00; and

F.  Pre-judgment and postjudgment interest, costs and attorneys' fees of this lawsuit.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in the amounts set forth above, plus prejudgment and postjudgment interest, plus costs and attorney's fees.


### COUNT TWO - BREACH OF CONTRACT - BUSINESS ACQUISITION

83.  Plaintiffs, by this reference, reallege all matters in all prior paragraphs herein as if

-16-

fully set forth.

84.  The Defendants Om Sikka, Kamla Sikka, Yash Paul Sikka and their corporation, Auto Fuels, Inc. breached the Business Acquisition Agreement by inducing the Plaintiffs to enter into said Agreement on the basis of fraudulent misrepresentations as alleged.

85.  Said false, misleading and fraudulent misrepresentations also constitute a breach of any and all agreements related to the Business Acquisition Agreement, constituting fraud in the inducement.

86.  As a direct and proximate result of said breach, the Plaintiffs are entitled to the following relief:

A. Return of all monies paid related to the acquisition of the Business, including the purchase price, any due diligence expense and related charges;

C.  Reimbursement for losses incurred in acquiring and operating the business in the amount in excess of $400,000.00;

D.  Damages for lost profits for the period of operations in the amount of approximately $120,000.00 or more, the actual amount to be proven at trial;

E.  Damages for lost profits of operation projected over the Lease term in the amount of approximately $360,000.00 or more, the actual amount to be proven at trial;

F.  Punitive damages in the amount of $2,000,000.00

G.  Pre-judgment and postjudgment interest, costs and attorneys' fees of this lawsuit.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in the amounts set forth above, plus prejudgment and postjudgment interest, plus costs and attorney's fees.

## COUNT FIVE - CIVIL CONSPIRACY

87.  Plaintiffs, by this reference, reallege all matters in all prior paragraphs herein as if fully set forth.

88.  The Sikka Defendants and the Nasir/Moussa Defendants and their related corporations and Defendant PMG conspired to fraudulently induce the Plaintiffs to purchase the Business by making the fraudulent misrepresentations alleged above.

89.  This conduct constitutes a civil conspiracy as defined in Va. Code §18.2-500.

90.  As alleged above, the Plaintiffs, as a direct and proximate result of this civil conspiracy, suffered actual damages in the amount of $880,000.

91.  Pursuant to said section of the Virginia Code, Plaintiffs are entitled to recover treble damages, that is, the amount of $2,664,000, as well as their costs of this suit and attorney's fees.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in the amount of $880,000 trebled to $2,664,000, plus prejudgment and postjudgment interest, costs and attorney's fees.


## COUNT SIX - BREACH OF MOTOR FUEL SUPPLY AGREEMENT

92.  Plaintiffs, by this reference, reallege all matters in all prior paragraphs herein as if fully set forth.

93.  As alleged, Defendant PMG supplied motor fuel to the Plaintiffs at a price which was unreasonable under the Virginia Uniform Commercial Code.

94.  As a direct and proximate result of this breach of contract, the Plaintiffs' business failed and they lost their entire investment in the Business.

95.  Additionally, as a direct and proximate result of this breach of contract, the Plaintiffs lost substantial sums of money attempting to keep the business open.

96.  Additionally, Defendant PMG induced the Plaintiffs to continue operating the Business by making representations to them that the pricing disparities would be rectified allowing them to operate profitably.

97.  In direct and detrimental reliance on said representations, the Plaintiff continued to operate the business at a loss for an extended period of time.

98.  The Plaintiffs are entitled to the following relief:

A.  Damages, consisting of all monies paid as rent, as operating losses of the business, as monies invested in the business and as rent and related charges to all these categories;

C.  Reimbursement for losses incurred in acquiring and operating the business in the amount in excess of $400,000.00;

D.  Damages for lost profits for the period of operations in the amount of approximately $120,000.00 or more, the actual amount to be proven at trial;

E.  Pre-judgment and postjudgment interest, costs and attorneys' fees of this lawsuit.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in the amounts set forth above, plus prejudgment and postjudgment interest, plus costs and attorney's fees.

## COUNT SEVEN - "RICO"

99.  Plaintiffs, by this reference, reallege all matters in all prior paragraphs herein as if fully set forth.

100.  As alleged, the Defendant PMG has engaged in a pattern of racketeering, consisting of defrauding buyers of retail gasoline service stations as alleged, by communicating false,

fraudulent and misleading information over the telephone calls originating and terminating in the United States, via e-mail originating in the United States directed to United States recipients, and via United States mail.  In addition to the Plaintiffs, the Defendant PMG has also engaged in the same pattern of conduct as alleged in the Complaint systematically with others to whom the Defendants and their affiliates and agents sell property, rent property and supply gasoline.

101.  In the instant case, as alleged, Defendant PMG and the Sikka Defendants and the Nasr Defendants conspired with Defendant PMG to induce the Plaintiffs to enter into the Motor Fuel Supply Agreement related to the acquisition of the Business, and lease the Premises, deliberately withholding from the Plaintiffs information related to the improper and predatory pricing practices of Defendant PMG, and also making misrepresentations to the Plaintiffs concerning the profitability and motor fuel sales volume of the Business.  This transaction involved a series of racketeering activities.

102.  All of these Defendants also conspired to provide false and misleading material information concerning the Business in order to induce the Plaintiffs to purchase and continue to operate the Business, knowing that the Plaintiffs would purchase and continue to operate the Business on the basis of such false and materially misleading information.  Said false and materially misleading information was communicated to the Plaintiffs in person, over the telephone and fax and via email.

103.  Additionally, funds were transferred by mail and wire to and from Defendants PMG, Nasr and Sikka by Plaintiff Energy Depot, Inc. for motor fuel sales, rent and the purchase price of the Business.

104.  Defendant PMG for all purposes and, for purposes of the lease and sale of the

Business transaction, the other corporate Defendants, constitute an "enterprise" as that term is defined in 18 U.S.C.A. § 1961, engaged in interstate commerce and the activities of which affect interstate commerce. Such activities in and affecting interstate commerce as alleged.

105. All of the acts above described were performed by the corporate Defendants, their agents, employees, officers, directors and/or shareholders, and the misrepresentations as alleged were distributed by said Defendants to the named brokers for the purposes of implementing these transactions in interstate commerce as buyers of this Business were solicited interstate and other businesses in which Defendant PMG was involved as alleged were located in different states, and sales of motor fuels are made by Defendant PMG in interstate commerce.

106. The persons involved in the enterprise are the individual Defendants, the corporate Defendants and their officers, directors, shareholders, employees and agents, Abolhoussein Ejtemai and the brokers named herein.

107. Said conduct constitutes a violation of 18 USC §1341 and 1343.

108. The acts of each Defendant and each employee, agent and representative of each Defendant, in the capacities as alleged, and separately in their individual capacities, are deemed to be the acts of, and are chargeable to and binding on every other Defendant with respect to the sale of the Business. Each instance of use of mails, wires and other transactions and communications as alleged constitutes a separate criminal act and a separate cause of damage to the Plaintiffs.

109. The use of the mails and wire for the purposes of effectuating the scheme to defraud Plaintiffs constitutes a separate racketeering activity, which occurred on more than one occasion in the last 10 years, constitutes a pattern of racketeering activity in violation of 18 U.S.C.A. §

1962, for which treble damages, costs of suit and attorney's fees may be sought under 18

U.S.C.A. § 1964(c).  Defendant PMG has engaged in at least the four transactions as alleged.

110. The individual Defendants and the Corporate Defendants in violation of 18 U.S.C.A.

§ 1962(a), used income (currently exceeding Three Hundred Thousand dollars) derived from a

pattern of racketeering activity in the operation of Defendants' corporations business for which

treble damages, costs of suit and attorney's fees are required under 18 U.S.C.A. § 1964(c).

111.   The individual Defendants, in concert with each other and with agents or

employees of Defendant PMG, including Abolhoussein Ejtemai, in violation of 18 U.S.C.A. §

1962(c), conducted the affairs of an enterprise engaged in interstate commerce through a pattern

of racketeering activity for which treble damages, costs of the suit and attorney's fees are required

under 18 U.S.C.A. § 1964(c).

112.   The individual and corporate Defendants and their respective agents or employees,

as alleged, in violation of 18 U.S.C.A. § 1962(d), conspired to violate Sections 1962(a) and

1962(c) of Title 18 of the United States Code for which treble damages, costs of suit and

attorney's fees are required under 18 U.S.C.A. § 1964(c).

113.   The individual and corporate Defendants, aided, abetted, counseled, commanded,

induced or procured the commission of the violations of the Federal Mail Fraud, Wire Fraud and

RICO Statutes, and therefore are each liable as principals pursuant to 18 U.S.C.A. § 2.

114.   In addition to the conduct of these Defendants in the instant case, Defendant PMG

has engaged in similar and virtually identical conduct regarding other purchases of gasoline

service stations.  In particular, Defendant PMG engaged in misconduct with respect to the

Gondels.

115.  Plaintiffs are entitled to $888,000 actual damages as specified above.

116.  Plaintiffs also demand punitive damages from the Defendants in the amount of $2 million or such amount has may be proven at trial.

117.  Plaintiffs may also recover from Defendants prejudgment and postjudgment interest, costs and attorneys fees.

118.  Plaintiffs are entitled to treble damages pursuant to the civil RICO statutory scheme and they demand treble damages in this case.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in the amount of $888,000.00, trebled to $2,664,000, plus $2 million in punitive damages, plus prejudgment and postjudgment interest, costs and attorney's fees.


## COUNT EIGHT - VIOLATION OF THE ROBINSON-PATMAN ACT

119.  Plaintiffs, by this reference, reallege all matters in all prior paragraphs herein as if fully set forth.

120.  As alleged, Defendant PMG supplies wholesale motor fuel to other retail gasoline service stations, particularly those owned and operated by this Defendant and its subsidiaries and affiliates but including service stations owned by others, at a wholesale motor fuel price substantially below the wholesale price which it charges the Plaintiffs, in the market area served by the gas station acquired by the Plaintiffs and in interstate commerce.

121.  Defendant PMG also supplies wholesale motor fuel to other gasoline retailers which it supplies, which are not its affiliates, at a higher wholesale price.

122. All such purchasers as alleged, who purchase wholesale motor fuel from Defendant PMG at lower wholesale prices as alleged, are favored purchasers.

123. The disparity in price as alleged constitutes prohibited price discrimination between the favored purchasers and the Plaintiffs.

124. Plaintiffs were engaged in competition with actual favored purchasers at all relevant times, and their ability to compete was illegally damaged by such price competition.

125. The relevant market area with respect to this Plaintiff is a 500 mile radius from the Business premises, as an automobile can travel approximately 500 miles on a tank of gas and an automobile with a full tank of gas within the 500 mile radius could be expected to patronize the Plaintiff's Business and other similarly situated businesses located within that radius.

126. Defendant PMG supplies wholesale motor fuel to favored purchasers within said 500 mile radius.

127. Said price disparity prevents and, at all relevant times, prevented the Plaintiffs and others from competing with those gasoline service stations supplied by Defended PMG at lower wholesale prices.

128. As such, Defendant PMG has injured competition and, specifically, injured the ability of the Plaintiffs to compete in the relevant market for retail gasoline sales as alleged.

129. Pursuant to the Robinson-Patman Price Discrimination Act, 15 USC §2(a) and 15 USC §13, Defendant PMG engaged in unlawful price discrimination as alleged.

130. Plaintiffs are entitled to $888,000 actual damages as specified above.

131. Plaintiffs also demand punitive damages from the Defendants in the amount of $2 million or such amount has may be proven at trial.

132.  Plaintiffs may also recover from Defendants prejudgment and postjudgment interest, costs and attorneys fees.

133.  Plaintiffs are entitled to treble damages pursuant to the Robinson-Patman and Virginia statutory scheme and they demand treble damages in this case.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in the amount of $888,000.00, trebled to $2,664,000, plus $2 million in punitive damages, plus prejudgment and postjudgment interest, costs and attorney's fees.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

Respectfully submitted,

*/s/ Thomas F. DeCaro, Jr.*
Thomas F. DeCaro, Jr. #34649
Attorney for Plaintiffs
14406 Old Mill Rd. #201
Upper Marlboro, MD 20772
703-255-0090 phone
301-464-4776 fax
tfd@erols.com   E-mail