**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

FEB 2 2 2013

MANOJ AGGARWAL, et al. )
    Plaintiffs, )
              )
         v. )        **Case No. 1:12cv0060**
              )
OM SIKKA, et al. )
    Defendants. )

### ORDER

This action grows out of the sale to plaintiffs of a business consisting of a gas station-car wash-convenience store combination (the "Business"), but not including the structures and real estate on which the Business is located. Plaintiffs in this action include Virginia residents Manoj Aggarwal and his wife, Anu Aggarwal, as well as their corporation, Energy Depot, Inc. (collectively "plaintiffs"). Energy Depot is a Virginia Corporation in which Mr. Aggarwal owns a 51% interest and Mrs. Aggarwal owns a 49% interest. There are two groups of defendants remaining in this action: (i) Kamla Sikka, Om Sikka, Yash Paul Sikka, and their company Auto Fuels, Inc. (collectively "the Sikka defendants"), who sold the Business to plaintiffs and who operated the Business prior to that sale; and (2) Chady Nasr, his wife, Carine Moussa, and their company PW Petroleum (collectively "the Nasr defendants"), who owned and operated the Business prior to the sale of the Business to the Sikkas and who continue to own the fixtures and real estate on which the Business sits. An additional defendant, Petroleum Marketing Group ("PMG"), which had an exclusive contract to supply fuel to the gas station was earlier dismissed from this action. *Aggarwal v. Sikka*, 1:12cv0060 (E.D. Va. Feb. 1, 2013) (Order).

After completion of discovery, the Sikka defendants, the Nasr defendants, and PMG filed motions for summary judgment. Following oral argument, an order issued on February 1, 2013

1

granting the summary judgment motions in part and deferring the summary judgment motions in part. *Id.* Specifically, the Nasr defendants' motion was granted as to Count Three, which alleged conspiracy, and the Sikka defendants' motion, the Nasr defendants' motion, and PMG's motion were granted as to Count Five, which alleged various RICO violations. Defendants' motions were deferred in all other respects. *Id.* The remaining counts and defendants are (i) Count One for fraudulent inducement against the Nasr defendants and (ii) Count Two for fraudulent inducement against the Sikka defendants. Also remaining is the Nasr defendants' motion for summary judgment on their counterclaim. This Order addresses the summary judgment motions with respect to these remaining counts and the counterclaim.

## I.

The facts, briefly stated, are as follows.[1] Prior to the events giving rise to this action, PMG owned the gas station located at 13295 Townbridge Drive, Woodbridge, Virginia 22192. In 2006, the Nasr defendants purchased the gas station from PMG, including the gas station's business assets, the land, the underground gasoline storage tanks, the gas pumps, an automatic car wash, and a convenience store. As a condition of the sale, Chady Nasr, his business partner Marwan Kassem, and PMG entered into a Motor Fuel Supply Agreement (the "MFSA") with a term of ten years.[2]

---

[1] The facts reported here are derived from the Second Amended Complaint and the summary judgment record. Where the parties dispute material facts, those disputes and their materiality or lack thereof are noted.

[2] There were two Motor Fuel Supply Agreements signed by Mr. Nasr, Mr. Kassem, and PMG. They were essentially the same except that one had a five-year term and the other had a ten-year term. The parties agree, and the assignments make clear, that the agreement with the ten-year term was assigned by the Nasr defendants to the Sikka defendants and later, by the Sikka defendants to plaintiffs.

On July 3, 2008, the Nasr defendants sold the Business to the Sikka defendants. The Nasr defendants retained ownership of the premises on which the Business is located and leased the premises to the Sikka defendants. On August 6, 2008, the Nasr defendants assigned the MFSA to the Sikka defendants.

In late 2009, the Sikka defendants decided to sell the Business and engaged Business Brokers USA, Inc. ("Business Brokers") to broker the sale. Using information ostensibly provided by the sellers, Business Brokers posted the Confidential Business Abstract ("CBA") for the Business on Business Brokers' website. The CBA stated (i) that the Business's Gross Annual Sales were $6,900,000; (ii) that the Owner's Annual Net was $120,000; (iii) that the gas station sold 100,000 gallons of gasoline per month at a pool margin of 12 cents per gallon; (iv) that the gas station sold 30,000 gallons of diesel fuel each month at a pool margin of 60 cents per gallon; (v) that the convenience store sold $45,000 of merchandise per month; and (vi) that the car wash had $8,000 of sales per month. (Doc. 156-2, page 5). The CBA also stated that the gas station had a five year fuel supply contract. *Id.* Finally, the CBA stated that

> Seller(s) acknowledge that he/she has provided the above listing information and warrants that information to be correct. Broker has no reason to question its accuracy. We recommend financial and legal counsel to assist Sellers and Buyers throughout any transaction.

*Id.*

Mr. Aggarwal saw the CBA on Business Brokers' website and became interested in purchasing the Business. He testified he was prompted to purchase a business at that time by the state of the economy. (Doc. 154-1, pages 8 and 29). Mr. Aggarwal evaluated various businesses that he might be interested in purchasing, including a couple of gas stations, a company that did industrial cleaning, and some types of franchises. (Doc. 154-1, page 29).

3

Between the time that Mr. Aggarwal first became interested in the Business and the time that the parties closed on the transaction, he investigated the gas station business generally and the Business more specifically. In this respect, Mr. Aggarwal testified that he did "as much due diligence as [he] possibly could" over the three month period prior to the purchase. (Doc. 154-1, page 60). He also demonstrated at several points during his depositions that he had acquired a relatively extensive knowledge of the gas station industry. (Doc. 154-1, pages 40 and 64). As part of his investigation, Mr. Aggarwal received some information on the MFSA, as well as some of the Business's financial information. Mr. Aggarwal testified, however, that he did not receive all of the documents he requested and that he was not provided with a copy of the MFSA until after the closing. (Doc. 154-1, page 61). Yet, Mr. Surinder Raheja, the CPA who had provided accounting services to Auto Fuels and who was also working for Business Brokers, testified that he did not refuse to give Mr. Aggarwal any documents that Mr. Aggarwal requested. (Surinder Raheja's 11/09/12 Depo. Tr. at 53:4-54:10).

On January 14, 2010, Mr. Aggarwal signed a letter of intent to purchase the Business for $230,000 plus the cost of the inventory. (Doc. 154-1, page 9; Doc. 156-2, page 5). This offer was accepted, and Mr. Aggarwal put down an earnest money deposit of $2,000. Mr. Aggarwal testified that once the letter of intent was in place he was able to begin conducting due diligence on the gas station. (Doc. 154-1, page 9).

On February 13, 2010, Mr. Aggarwal signed a second Business Sales and Purchase Agreement (the "Agreement") for the Business. (Doc. 154-1, page 84-87). Under the Agreement, Mr. Aggarwal agreed to purchase the Business from the Sikkas for $230,000 plus the cost of inventory. The Purchase Agreement also stated that the following conditions were to be satisfied prior to the closing: (a) approval of the buyer by the landlord (*i.e.*, the Nasrs); (b)

4

approval of the buyer by the fuel supplier (*i.e.*, PMG); (c) the gas station was to be in compliance with Virginia Regulation 62-761; (d) potholes in the parking lot were to be fixed by the seller; and (e) the car wash was to be power washed. At the time he signed the Agreement, Mr. Aggarwal tendered a deposit of $18,000, bringing the total deposit to $20,000. The Agreement stated that in the event of a default, the defaulting party would owe the other party liquidated damages of $20,000.

On April 19, 2010, the lease between PW Petroleum, Inc. and Auto Fuels, Inc. was assigned to Energy Depot, Inc., the Aggarwal's company (Doc. 154-1, pages 89-93). The same day, Mr. and Mrs. Aggarwal personally guaranteed the lease. (Doc. 154-1, pages 113-101). On April 22, 2010, the Sikka defendants' company, Auto Fuels, Inc., assigned the May 1, 2006 MFSA with PMG to Energy Depot and Manoj Aggarwal. (Doc. 154-1, pages 103-4). Finally, on April 23, 2010, Auto Fuels, Inc. closed on the sale of the Business to Energy Depot. (Doc. 154-1, page 106-108).

Mr. Aggarwal operated the business for approximately one year, from April 2010 until the end of March or the beginning of April 2011. (Doc. 154-1, page 25). Mr. Aggarwal testified that he knew he had been defrauded within two weeks of purchasing the Business and that while he was operating the Business, he was losing $8,000 to $10,000 per month on average.

Mr. Aggarwal decided to sell the Business. To assist him in this regard, he hired Business Brokers to act as his agent. Mr. Aggarwal received several offers for the Business, including an offer from Mr. Frank Joyce, the president of Pallone Inc. Mr. Joyce, in an offer dated November 15, 2010 offered Mr. Aggarwal $250,000 for the Business. (Doc. 157-1, page 41). Mr. Aggarwal also testified that he never saw Mr. Joyce's offer and although he was aware that there was an offer to buy the business, he was not aware of the offered price. (Doc. 154-1,

page 52). The Aggarwal's lease of the gas station premises provided that the Nasrs had to approve any future assignments of the lease, and Mr. Aggarwal claims that Mr. Nasr used this provision to block the sale of the Business.

Specifically at issue on summary judgment are the following questions:

> (1) Whether statements alleged to be fraudulent misrepresentations qualify as false representations of existing facts under governing law;

> (2) Whether plaintiffs' reliance on the alleged misrepresentations was unreasonable as a matter of law; and

> (3) Whether the Nasr defendants are entitled to summary judgment on their counterclaim.

**II.**

In the Second Amended Complaint, Mr. Aggarwal alleges that defendants made a number of materially false statements to him and thereby fraudulently induced him to purchase the Business, to enter into the lease for the premises, and to continue to operate the Business at a loss after the purchase. It is axiomatic under Virginia law[3] that in order to prevail on a claim for fraudulent inducement to contract, a plaintiff must establish the following by clear and convincing evidence: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Research Corp. v. Alequin,* 247 Va. 143, 148 (Va.1994). *See also Brame v. Guarantee Fin. Co.*, 139 Va. 394, 124 S.E. 477, 481 (1924).

---

[3] The parties correctly agree that Virginia's choice of law rules govern the state law claims in this action. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). And, Virginia's choice of law rules select the law of the place of the wrong in tort actions. *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998). In this case, Virginia law applies because all of the alleged wrongful activity occurred within Virginia.

The record reflects that plaintiffs allege that the following fraudulent statements were made to Mr. Aggarwal that induced him to purchase the Business:

(1)     Mr. Sikka's alleged statement that the gas station was "an awesome business". (Doc. 173-3, page 45).

(2)     Mr. Sikka's alleged statement "Good supplier, good prices. You will do fine, it's a good business." (Doc. 173-3, page 45; Doc. 154-1, page 31).

(3)     Mr. Nasr's alleged comments when asked about Sheetz to "F Sheetz" and his statement that "Sheetz doesn't count." (Doc. 157-1, page 76).

(4)     Mr. Nasr's alleged statement that Mr. Sikka was making good money (Doc. 157-1, page 72).

(5)     The Nasr defendants' alleged representations that when the term of the MFSA expired, Mr. Aggarwal would be able to obtain approximately $200,000 in cash and in-kind improvements to the gas station in exchange for signing a new ten year distribution agreement with a supplier. (Doc. 157-1, page 70).[4]

(6)     Mr. Nasr's alleged statement that most of the money and in-kind improvements to the gas station offered as incentives for entering into a new fuel supply agreement could be recovered when Mr. Aggarwal sold the gas station. (Doc. 179, page 45).

(7)     The alleged statements that the Sikkas were selling the Business because they were moving to India. (Doc. 173-3, page 45).

(8)     Mr. Nasr's alleged statements that he would not allow Mr. Aggarwal to sell the Business to anyone except a large corporation, such as Exxon or 7-Eleven. (Doc. 176-2, page 8).

(9)     Mr. Nasr's alleged threat to take legal action against Mr. Aggarwal if he closed the Business. (Doc. 176-2, page 8).

(10)    Alleged representations by the Sikka defendants and the Nasr defendants that the MFSA assigned to plaintiffs had a five year term, rather than a ten year term. These representations include faxing a copy of the MFSA with a five year term to Mr. Aggarwal on September 29, 2010. (*See e.g.*, Doc. 154-1, page 53).

---

[4] The Nasrs, in their affidavits, deny having made this representation. (Doc. 179, pages 20 and 27).

(11)   Mr. Nasr's alleged statement that PMG was obligated to find the best price for fuel each day. (Doc. 176-2, page 2).

(12)   Information on the Business's revenue, profitability, and sales volume contained in the CBA, which information plaintiffs claim was orally confirmed by both the Sikka defendants and the Nasr defendants.[5]

(13)   Mr. Nasr's alleged statement that Mr. Sikka had operated the Business profitably in the past. (Doc. 176-2, page 5).

(14)   The Sikkas' alleged representations, and the Nasrs' alleged confirmation, that margins for the car wash would be about 90%; margins for the convenience store would be 25% or 28%; pool margins for gasoline were $0.11 or $0.12 per gallon; and pool margins for diesel were $0.35 to $0.40 per gallon. (Doc. 154-1, page 4).

(15)   The Nasrs' alleged statement that the car wash and convenience store were an added benefit because the car wash would pay for the rent, and then the gasoline and the convenience store would pay for the overhead, resulting in a healthy profit. (Doc. 176-2, page 5).[6]

(16)   Mr. Nasr's alleged statement that Mr. Sikka always paid his rent on time. (Doc. 157-1, page 72).

(17)   Mr. Nasr's alleged statements that he could get better prices from PMG. (Doc. 154-1, page 53).

To begin with, it is necessary to consider whether each of these statements constitutes a representation that can serve as the basis for a fraud claim under Virginia law. This is so because under settled Virginia law, not every statement, even if false, constitutes fraud. Specifically,

---

[5] The Nasr defendants state in their affidavits that they never told the Aggarwals that the financial information in the Confidential Business Abstract was correct. (Doc. 179, pages 20 and 27).

[6] The Nasrs, in their affidavits, deny ever having told Mr. Aggarwal that the money from the car wash alone would cover the rent. (Doc. 179, pages 20 and 27). Additionally, this alleged representation suffers from a lack of coherence. If the car wash pays for the rent, which incidentally is part of the overhead, and the gasoline and convenience store cover the remaining overhead, it is unclear where the profit would be generated.

> [i]t is well settled that a misrepresentation, the falsity of which will
> afford ground for an action for damages, must be of an existing
> fact, and not the mere expression of an opinion. The mere
> expression of an opinion, however strong and positive the language
> may be, is no fraud.

*Saxby v. Southern Land Co.,* 109 Va. 196, 198 (1909). There is no precise test for determining when a statement constitutes an opinion. Instead,

> each case must in a large measure be adjudged upon its own facts,
> taking into consideration the nature of the representation and the
> meaning of the language used as applied to the subject matter and
> as interpreted by the surrounding circumstances.

*Mortarino v. Consultant Engineering Services, Inc.,* 251 Va. 289, 293 (1996) (quoting *Packard Norfolk, Inc. v. Miller,* 198 Va. 557, 562 (1956)). But it is clear that "[c]ommendatory statements, trade talk, or puffing, do not constitute fraud because statements of this nature are generally regarded as mere expressions of opinion which cannot rightfully be relied upon, at least where the parties deal on equal terms." *Tate v. Colony House Builders, Inc.,* 257 Va. 78, 84 (1999) (citing *Henning v. Kyle,* 190 Va. 247, 252 (1949)). It is equally clear that statements such as saying a vehicle is in "excellent" condition, that something was of the "highest quality," or that something was in "good condition" are matters of opinion. *See, e.g., Lambert v. Downtown Garage, Inc.,* 262 Va. 707, 713 (2001) ("excellent condition"); *Tate,* 257 Va. at 84 ("highest quality"); *Henning,* 190 Va. at 252 ("good condition").

These settled principles, applied to the seventeen alleged misrepresentations, compel the conclusion that statements (1) through (6) are not actionable fraudulent misrepresentations because they are mere expressions of opinion and predictions about the future, rather than statements of existing facts. *Saxby,* 109 Va. at 198. Also not actionable as a basis for fraud, is statement number (7) that the Sikkas were selling the business because they were moving to India. This statement is immaterial to the sale. A fact is material "when it influences a person to

enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 563 (1956) (quoting 23 Am. Jur., Fraud and Deceit, § 111, p. 892, 8 M.J., Fraud and Deceit, § 7, p. 699). Statement number (7) does not meet this test; the assertion that the Sikkas were selling the Business because they were moving to India cannot reasonably be said to have induced Mr. Aggarwal to consummate the sale, nor can it be reasonably said that without this statement the transaction would not have occurred.

Additionally, plaintiff has failed to show that alleged statements (8) and (9) are actionable. Both statements were allegedly made by Mr. Nasr to Mr. Aggarwal after plaintiffs had purchased the Business, and both statements were allegedly made for the purpose of inducing plaintiffs to continue to operate the Business. Neither statement can serve as a basis for a fraud claim because neither statement is a misrepresentation of an existing fact. Instead, both statements are merely claims of legal right, which might be disputed by Mr. Aggarwal, but are not statements of existing facts. Thus, in statement (8), plaintiffs allege that Mr. Nasr told Mr. Aggarwal that he would not allow him to sell the Business to anyone except "a very healthy, big corporation, something like a 7-Eleven or Exxon." (Doc. 176-2, page 8). This is merely an assertion of a legal right inasmuch as the lease states that the tenant may not assign the lease "[e]xcept upon the reasonable approval of Landlord." (Lease Agreement, page 18). Therefore, under the terms of the lease, Mr. Nasr was entitled to exercise reasonable discretion in approving or disapproving any future tenants. Similarly, in statement (9), Mr. Aggarwal alleges that Mr. Nasr threatened to take legal action against him if he closed the gas station. Mr. Nasr did have a right to take action against Mr. Aggarwal if Mr. Aggarwal or his company stopped paying rent. This statement, like statement, (8) is merely a claim of a legal right, given that plaintiffs were

obligated to pay rent, and Mr. Nasr clearly had the right to take action if plaintiffs ceased to pay rent.

In sum, only statements (10) through (17) are statement of existing facts that could potentially serve as the basis for fraud claims provided the other elements of fraudulent misrepresentation are met and proved by clear and convincing evidence. This does not end the analysis, however, as the reasonableness of plaintiffs' reliance on statements (10) through (17) must be assessed.

## III.

In statement (10), Mr. Aggarwal contends that the Nasr defendants fraudulently induced him to enter into the lease, and the Sikka defendants fraudulently induced him to purchase the Business, by representing that the MFSA assigned to plaintiffs had a five-year term, rather than a ten-year term.

As the Fourth Circuit has previously stated,

> [i]t is not enough [under Virginia law] for a plaintiff in a fraud action to show that it acted to its detriment in response to the defendant's false representation or concealment of a material fact. 'In order to prove reliance, a plaintiff must demonstrate that its reliance upon the representation was reasonable and justified.'

*Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999) (interpreting Virginia law and quoting *Meridian Title Ins. Co. v. Lilly Homes, Inc.*, 735 F. Supp. 182, 185 (E.D.Va.1990), *aff'd*, 934 F.2d 319 (4th Cir.1991)). And importantly, when a plaintiff undertakes his own investigation, whether complete or not, he can no longer say that he reasonably relied on the false representations made to him. *Harris v. Dunham*, 203 Va. 760, 767 (1962). The case law makes clear that it is no longer reasonable for a purchaser to rely on false representations where the purchaser "makes a partial inquiry, with full opportunity of complete

11

investigation, and elects to act upon the knowledge obtained from that partial inquiry." *Hitachi*, 166 F.3d at 629. Similarly, if a purchaser had information that would "excite the suspicions of a reasonably prudent person" it becomes the purchaser's "duty to take advantage of the opportunity and ascertain the true condition." *Poe v. Voss*, 196 Va. 821, 826, 86 S.E.2d 47, 50 (1955). Where the results of an investigation would have excited the suspicions of a reasonably prudent person, whether the investigation is completed or not, reliance cannot be reasonable. *Id.*

There is an exception to the general rule that once an investigation is undertaken, reliance is no longer reasonable. "[T]he seller must not say or do anything to throw the purchaser off his guard or to divert him from making the inquiries and examination which a prudent man ought to make." *Van Deusen v. Snead*, 247 Va. 324, 329 (1994) (quoting *Armentrout v. French*, 220 Va. 458, 466 (1979)).

These principles, applied to the facts in the summary judgment record, make clear that Mr. Aggarwal undertook an investigation into the term of the MFSA and elected, in the end, not to complete the investigation by obtaining a copy of the MFSA before signing the contract of sale. Although Mr. Aggarwal says that he repeatedly requested a copy of the MFSA, he testified that he never received the document. Instead, he proceeded to investigate the term of the MFSA by other means, including discussing it with PMG's district manager, Bill Lopez, who provided information suggesting that the term of the MFSA was ten years, not five. In this respect, Mr. Aggarwal testified that prior to closing on the sale, on April 5, 2010, he met with Mr. Lopez at a Panera Restaurant located near the Business. Mr. Aggarwal testified that either at this meeting or prior to it, he received a copy of PMG's Account Set-Up Checklist. (Doc. 154-1, page 12). In the Contract Term (Years) column of the Checklist, the number "10" appeared. Mr. Aggarwal saw this, and on a blank copy of the form, wrote "10 WHY?". (Doc. 154-1, page 12; Doc. 157-

1, page 57-58).   Mr. Aggarwal testified that at the April 5 meeting, he called Mr. Lopez's attention to the "10" on the form and questioned Mr. Lopez about the MFSA's term.   (Doc. 154-1, page 12).   Mr. Aggarwal described Mr. Lopez's response as follows:

> [Mr. Lopez] told me, this is a form letter, it's printed out the same for everybody.   So he's like, as far as I recall, I don't see too many five-year contracts.   It may be a five-year; I don't know that, but I'll get you a copy.   Better yet, why don't you get one from Chady Nasr, your landlord, because he should have a copy that he can share with you.

(Doc. 163, page 6).   Mr. Aggarwal elected not to follow Mr. Lopez's advice to obtain a copy of the MFSA from Mr. Nasr.

Nor was the meeting with Mr. Lopez the only circumstance that should have alerted Mr. Aggarwal that the MFSA's term was ten years, not five.   A week after the Panera meeting, Mr. Lopez sent the Account Set-Up Checklist to Mr. Aggarwal via email on April 12, 2010.   (Doc. 154-1, page 14).   Mr. Aggarwal testified that most of the information on the form had already been filled in before it was sent to him.   *Id.*   Mr. Aggarwal also testified that the "Contract Term" Field on the form was already filled in with the number "10".   (Doc. 154-1, page 15).

The fact that the Account Set-Up Checklist—a document prepared by PMG, the counterparty to the MFSA—stated that the contract term was ten years, not five, as well as the fact that Mr. Aggarwal was advised to obtain a copy of the agreement, made it unreasonable for him to continue to rely on any alleged statements that the term of the MFSA was five years. These undisputed facts and circumstances would have "excite[d] the suspicions of a reasonably prudent person" thereby imposing on Mr. Aggarwal a "duty... [t]o ascertain the true condition," *i.e.*, the true term of the MFSA.   *Poe*, 196 Va. at 826.   Mr. Aggarwal's failure to do so renders unreasonable as a matter of law his reliance on representations that the MFSA term was five

years. Indeed, Mr. Aggarwal's failure to obtain a copy of the MFSA when advised to do so, is essentially the same as failing to read a contract, and at least one court in this district has noted that "[a] fraud claim arising out of a party's entry into a contract is unreasonable when the allegedly defrauded party fails to read or understand the contract at issue." *Wells Fargo Bank, Nat. Ass'n v. Smith*, 3:10-CV-411, 2010 WL 4622176 (E.D. Va. Nov. 5, 2010) (citing *Clemons v. Home Savers, LLC*, 530 F.Supp.2d 803, 811 (E.D. Va. 2008)). In sum, it was unreasonable for Mr. Aggarwal to rely on the CBA's statement of the MFSA's term when he had strong evidence that the MFSA had a ten-year term and failed to obtain a copy of the agreement or otherwise take steps to ascertain the MFSA's true term. *See Poe*, 196 Va. at 826 (standing for the proposition that once the suspicion of a reasonably prudent person would have been excited, reliance is no longer reasonable); *Harris v. Dunham*, 203 Va. at 767 (when a plaintiff undertakes his own investigation, even an incomplete one, it is no longer reasonable for him to continue to rely on the misrepresentation).

Also unreasonable, is any reliance on statement (11) where Mr. Nasr allegedly told Mr. Aggarwal that PMG was obligated to find the best price for fuel each day. (Doc. 176-2, page 2). A complete investigation would have revealed instead that the MFSA had no such provision and simply stated that the price of the fuel would be computed based on the price at the supplying terminal, without saying which terminal that should be. Therefore, summary judgment must be granted with respect to plaintiffs' claims based on statement (11) because it was unreasonable as a matter of law for Mr. Aggarwal to rely on these statements.

## IV.

The summary judgment record contains undisputed facts that demonstrate that Mr. Aggarwal initiated an investigation into the Business's finances, but chose not to complete the

14

investigation before closing on the sale.  In statements (12) through (16), plaintiffs claim that the

Sikka and Nasr defendants made various false representations to them about the Business's

finances, including its revenues, profitability, sales volumes, the ability of various sources of

revenue to cover various expenses, and Mr. Sikka's history of paying rent on time.  Plaintiffs

have presented evidence from which it appears that the revenue and profitability figures shown

on the CBA may have been inflated.  Auto Fuel's Inc.'s tax returns from 2008, 2009, and 2010

show revenue and profit figures that are substantially lower than the figures shown in the CBA.

(Doc. 173-3, pages 6-39).

Although it is clear that Mr. Aggarwal undertook an investigation into the Business's

finances, there is a dispute as to whether Mr. Aggarwal received all of the documents he

requested for his investigation.  Mr. Aggarwal testified that he did not, but Mr. Surinder Raheja,

the CPA who provided accounting services to Auto Fuels and who was also working for

Business Brokers, testified that he did not refuse to give Mr. Aggarwal any documents that Mr.

Aggarwal requested.  (Surinder Raheja's 11/09/12 Depo. Tr. at 53:4-54:10).  Mr. Raheja testified

that prior to the purchase, Mr. Aggarwal took all of the documents from him and then retained

the documents for a few months while he decided whether to make the purchase.  *Id.*  Mr. Raheja

testified that he even provided Mr. Aggarwal with the documents on more than two occasions.

*Id.*

Assuming that Mr. Aggarwal's version of the facts is correct—as is appropriate on

summary judgment—Mr. Aggarwal's reliance on financial information provided to him verbally

or in the CBA was unreasonable, given that he chose to close on the purchase without receiving

all of the documents he had repeatedly requested, thereby choosing not to complete his

investigation.  As was made clear in *Harris v. Dunham*, 203 Va. at 767, when a plaintiff

15

undertakes his own investigation, even an incomplete one, it is no longer reasonable for him to continue to rely on the misrepresentation.

As Mr. Aggarwal's testimony confirms, that is precisely what occurred. Thus, Mr. Aggarwal testified that in response to his requests for supporting financial documents, he received some of Mr. Sikka's financials for the Business prior to closing on the deal. (Doc. 154-1, page 48). Specifically, Mr. Aggarwal testified that he received "[s]ales figures for almost a year or maybe a year; the taxes that they had paid for the gasoline supply; the taxes that they had paid for the retail sales." *Id.* Mr. Aggarwal clarified that by "sales figures," he meant spreadsheets showing daily revenue going back almost a year for fuel of all types (regular, medium high test, and diesel), the revenue from lottery ticket sales, the revenue from the convenience store, and the revenue from the car wash. (Doc. 154-1, page 31). Mr. Aggarwal testified that the numbers shown in the supporting spreadsheets showed gross annual sales that were lower, but "pretty close" to the $6.9 million in revenue shown on the CBA (Doc. 154-1, page 58).

It is unclear on the current record whether the sales figures and sales tax information Mr. Aggarwal received were falsely inflated, but it is clear that the information provided did not appease Mr. Aggarwal. Mr. Aggarwal was not lulled into a false sense of security or "divert[ed] [] from making the inquiries and examination which a prudent man ought to make." *Van Deusen*, 247 Va. at 329. Had he been lulled or diverted and ended his investigation, it would be a question for the jury whether his reliance on the information provided was reasonable. But Mr. Aggarwal was not lulled or diverted from pursuing his investigation; he repeatedly testified that he continued to request information, including the Business's tax returns and other documentation, right up until the day of the closing. (Doc. 157-1, page 73). Mr. Aggarwal

16

claims he never received this financial information, but nonetheless elected to close on the sale. *Id.* In other words, Mr. Aggarwal commenced an investigation and continued it up to closing, but then elected to close without completing the investigation. Under these circumstances, his reliance was unreasonable.

Mr. Aggarwal testified that he knew he was not going to get the financial documentation that he requested for his investigation when Mr. Raheja told him "every single businessman lies on their taxes. Nobody wants to pay the Federal Government taxes. Why would you even want to see the tax returns? They're not going to tell you anything." (Doc. 154-1, page 30). Here is a relevant exchange from Mr. Aggarwal's deposition:

> Q: When you went to closing on the business, had you reviewed all the documents that you needed to review to determine whether or not the business was a profitable business?
>
> A: I did not.
>
> Q: Then you went to closing without seeing the documents you needed to see to determine whether or not this was a profitable business?
>
> A: Correct. I was told some of those documents would be shown to me before I signed on the dotted line at the closing, and they were not there. Those documents were still not there.

(Doc. 157-1, page 73).

Because Mr. Aggarwal failed to complete the investigation he began, no reasonably jury could find by clear and convincing evidence, as required, that he reasonably relied on the alleged misrepresentations concerning the Business's financial health—statements (12) through (16). Summary judgment must therefore be granted as to those statements.

## V.

17

As discussed above, plaintiffs are unable to support their claims that they were fraudulently induced to purchase the Business or to enter into the lease. In Count One, plaintiffs also claim that the Nasr defendants fraudulently induced them to continue operating the Business even after they had purchased the Business and learned that it was losing money. It was unreasonable for Mr. Aggarwal to rely on any statements about the Business's performance after the purchase when he cannot prove that he reasonably relied on such statements before the purchase and when he was able to observe the Business's performance first-hand under his own operation after the closing.

Plaintiffs assert that the Nasrs fraudulently induced them to continue to operate the Business by representing even after the purchase that the MFSA had a five year term, including by faxing the first page of the April 7, 2006 MFSA to Mr. Aggarwal on September 29, 2010. That version of the MFSA did, in fact, have a five-year term, but that was not the operative version of the agreement assigned to Mr. Aggarwal. (Doc. 154-1, page 103-04).

It was unreasonable as a matter of law for Mr. Aggarwal to rely on the September 29, 2010 fax because the assignment clearly stated that he was assigned the May 1, 2006 agreement, not the April 7, 2006 agreement, and because of the information Mr. Aggarwal received from Mr. Lopez prior to signing the agreement, as well as information conveyed by other PMG representatives after the signing of the agreement. Similarly, it was unreasonable to rely on statements contingent upon the length of the contract, such as those about receiving incentives for signing a new contract.

In statement (17), Mr. Aggarwal testified that Mr. Nasr told him after the sale closing that Mr. Nasr could secure better prices from PMG and that Mr. Aggarwal should wait to hear from Mr. Nasr because he would talk with PMG. (Doc. 154-1, page 53). This statement was not a

18

statement of an existing fact and is therefore not actionable as fraud. *See Saxby*, 109 Va. at 198. It also was unreasonable for Mr. Aggarwal to rely on such a statement when plaintiffs and PMG were the only parties to the MFSA, and Mr. Nasr was no longer a party to the agreement. Therefore, summary judgment must be granted as to this statement.

## VI.

The Nasr defendants have asserted a counterclaim against plaintiffs based on plaintiffs' breach of the lease agreement. The Nasrs contend that plaintiffs failed to pay rent for April 2011 or any months thereafter and that plaintiffs refused to quit the premises even after being served a five-day notice demanding that they do so. The Nasr defendants also contend that when plaintiffs returned possession of the premises, the car wash was not operational and required $10,298.75 of repairs. The Nasr defendants assert that plaintiffs have damaged them in the amount of $124,585.31, including unpaid rent, late fees, real estate taxes, sewer and water fees, car wash repairs, and the cancellation fee for the Motor Fuel Supply Agreement.

The lease for the premises originally executed between the Sikka defendants and the Nasr defendants was assigned to Energy Depot, and the Aggarwals guaranteed the lease in their individual capacities. (Doc. 156-3, pages 1-12). Mr. Aggarwal admits that he signed the lease assignment and guarantee. (Doc. 157-1, page 67). Mr. Aggarwal also testified that he did not pay the rent for April or any period thereafter and that he received a notice requiring him to either pay the rent or vacate the premises but he did neither. (Doc. 157-1, pages 67-68). Mr. Aggarwal ultimately vacated the premises in May of 2011. (Doc. 157-1, page 68). The Nasr defendants assert that they were unable to begin collecting rent from a new tenant until August 1, 2011 at a base rental rate of $11,000 per month. The Nasr defendants also assert that they had to pay to cancel the MFSA in order to attract a new tenant.

Although Mr. Aggarwal acknowledged that he had guaranteed the lease, he claims that he was not obligated to make the rent payments because "the entire deal [he] entered with Mr. Nasr and the Sikkas and PMG was based on fraudulent premises." (Doc. 157-1, page 68). As previously discussed, plaintiffs' claims that they were fraudulently induced to purchase the Business, to enter into the lease, and to continue to operate the Business at a loss fail on summary judgment. Therefore, plaintiffs are liable to the Nasr defendants for breach of the lease agreement, and it follows that the Nasr defendants are entitled to partial summary judgment on the breach of the lease counterclaim. Yet, the Nasr defendants have not provided adequate proof of the damages resulting from that breach, or any steps taken to mitigate those damages, to allow the amount owed to be determined on the summary judgment record. Therefore, the amount of damages proximately caused by the breach of the lease must be resolved at trial.

Additionally, the Aggarwals dispute the Nasrs' claim that the car wash was broken when they vacated the premises. Mr. Aggarwal testified that cars were successfully washed the day he closed the business. (Doc. 157-1, page 68). It is a jury question whether the car wash was in a state of disrepair at the time that Mr. Aggarwal returned possession of the premises. Therefore, the questions of liability and damages for claims related to the car wash must proceed to trial.

## VII.

Accordingly,

It is hereby **ORDERED**, that the Sikka defendants' motion for summary judgment is **GRANTED** in all respects.

It is further **ORDERED** that the Nasr defendants' motion for summary judgment as to the complaint is **GRANTED**.

It is further **ORDERED** that the Nasr defendants' motion for summary judgment as to the counterclaim is **GRANTED IN PART** and **DENIED IN PART**. Specifically, it is **GRANTED** with respect to plaintiffs' liability for breach of the lease agreement. It is **DENIED** as to the amount of damages associated with the breach of the lease agreement and as to liability and damages with respect to the car wash.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, VA
February 22, 2013

/s/

T. S. Ellis, III
United States District Judge

21